**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

IOWA CITIZENS FOR COMMUNITY
IMPROVEMENT, *et al.,*

    *Plaintiffs,*

    v.

COUNCIL ON ENVIRONMENTAL
QUALITY, *et al.,*

    *Defendants.*

Civ. No. 1:20-cv-02715-TJK

**DECLARATION OF DANIEL E. ESTRIN
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

---

**DECLARATION OF DANIEL E. ESTRIN**

I, DANIEL E. ESTRIN, declare that if called as a witness in this action I would

competently testify of my own personal knowledge, as follows:

1.    I am the General Counsel and Advocacy Director of Waterkeeper Alliance

(Waterkeeper). I have worked with the Waterkeeper movement in various capacities for more

than 28 years. As Waterkeeper's General Counsel and Advocacy Director, I am responsible for

supervising all of Waterkeeper's legal advocacy work, including all litigation to which

Waterkeeper is a party.

2.    Waterkeeper is a not-for-profit corporation organized under the laws of the State

of New York and a charitable corporation under section 501(c)(3) of the Internal Revenue Code.

Waterkeeper maintains its headquarters at 180 Maiden Lane, Suite 603, New York, New York

10038.

1

3.      Waterkeeper is a global movement of on-the-water advocates who patrol and protect over 2.7 million square miles of rivers, streams, and coastlines in North and South America, Europe, Australia, Asia, and Africa. Waterkeeper seeks to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable consistent with the goals of the federal Clean Water Act (CWA) and other laws. Waterkeeper works toward this vision through direct advocacy and through the grassroots advocacy of its Waterkeeper member and affiliate organizations, which Waterkeeper connects and supports to provide a voice for waterways and their communities worldwide. To champion clean water and strong communities, Waterkeeper also: (1) supports and empowers Waterkeeper organizations to protect communities, ecosystems, and water quality; (2) promotes the Waterkeeper model for watershed protection worldwide; and (3) advocates for issues common to Waterkeeper organizations.

4.      Waterkeeper is a membership organization with two classes of members— licensed organizational members and individual members. Waterkeeper's Board of Directors must approve all licensed organizational members. Once approved, member organizations are entitled to vote, through a designated representative, on matters at member organization meetings. Among other requirements, member organizations must conform to Waterkeeper Quality Standards, participate in membership meetings, elect the President of Waterkeeper, and elect the Waterkeeper Council, which is composed of 25 member organization representatives. Waterkeeper Council members, in turn, elect a total of six Council members to serve on Waterkeeper's Board of Directors.

5.      Waterkeeper currently connects approximately 350 Waterkeeper member and affiliate organizations in 47 countries on six continents, including approximately 160

2

Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers,

Creekkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, and

Waterkeepers (U.S. Member Organizations), and 20 affiliate organizations licensed by

Waterkeeper in the United States (U.S. Affiliate Organizations). Our U.S. Member Organizations

and U.S. Affiliate Organizations cumulatively have tens of thousands of individual members

who live, work, and recreate on waterways and in watersheds across the United States and whose

interests are injured by regulatory actions that weaken protections for waterways and the

communities that rely on them.

6.      Local Environmental Action Demanded Agency, Inc. (LEAD Agency) is a

501(c)(3) nonprofit public interest organization headquartered in Miami, Oklahoma. LEAD

Agency has been a licensed Waterkeeper Member Organization since 2005 for its Grand

Riverkeeper program and since 2016 for its Tar Creekkeeper program. Upon information and

belief, LEAD Agency is submitting a member declaration concurrently with this filing.

7.      Lake Erie Waterkeeper is a 501(c)(3) nonprofit public interest organization

headquartered in Toledo, Ohio. Lake Erie Waterkeeper is a Waterkeeper Member Organization

and has been licensed since 2005. Upon information and belief, Lake Erie Waterkeeper is

submitting a member declaration concurrently with this filing.

8.      Waterkeepers Chesapeake is a not-for-profit corporation organized under the laws

of the State of Maryland. It is a coalition of 17 independent U.S. Member Organizations working

for clean water in and around Chesapeake Bay. Waterkeepers Chesapeake's mission is to make

the waters in the Chesapeake Bay watershed swimmable, fishable, and drinkable. Waterkeepers

Chesapeake has been a licensed Waterkeeper Regional Entity and a licensed U.S. Member

Organization since 2014. Waterkeepers Chesapeake is a co-plaintiff in this action and, upon information and belief, is submitting a declaration concurrently with this filing.

9.     Assateague Coastal Trust (ACT) is a 501(c)(3) nonprofit public interest organization headquartered in Berlin, Maryland. ACT is the designated license-holder for Assateague Coastkeeper, a U.S. Waterkeeper Member Organization since 2002 and a member of Waterkeepers Chesapeake since 2012. Upon information and belief, ACT is submitting a declaration concurrently with this filing.

10.     Lower Susquehanna Riverkeeper (LSR) is a 501(c)(3) nonprofit public interest organization headquartered in Wrightsville, Pennsylvania. LSR has been a U.S. Waterkeeper Member Organization since 2006 and a member of Waterkeepers Chesapeake since 2012. Upon information and belief, LSR is submitting a declaration concurrently with this filing.

11.     Waterkeeper supports its U.S. Member Organizations and U.S. Affiliate Organizations, and their individual members, through coordinated litigation and other advocacy, as well as by providing a centralized hub for sharing scientific, legal, and administrative resources with these organizations across the country; by expanding local Waterkeepers' abilities to affect environmental compliance and policy on a national level; by sponsoring educational and capacity-building programs for U.S. Member Organizations and Affiliate Organizations; by providing legal support to these organizations; and by protecting and administering the trademarks covering "Waterkeeper" and the other "-keeper" names above.

12.     The second class of Waterkeeper members comprises more than 15,000 individual supporting members who assist Waterkeeper through financial contributions. Waterkeeper supports these members by advocating on behalf of their clean water interests in local and national fora, including before legislative bodies, government agencies, and courts of

4

law, and by keeping them informed about environmental issues that impact their communities and others around the country.

13.     Many of Waterkeeper Alliance's U.S. Member and Affiliate Organizations are actively working to protect their watersheds from pollution caused by dense concentrations of cattle, dairy, poultry, and/or swine concentrated animal feeding operations (CAFOs), and related industries, such as slaughterhouses (collectively, the CAFO industry). Additionally, these U.S. Member and Affiliate Organizations have members who live, work, and recreate in areas affected by the CAFO industry.

14.     CAFO industry pollution can harm ecosystems and human health and result in fish kills, algal blooms, contamination of drinking water sources, and transmission of disease-causing pathogens. This type of pollution is impacting many of the watersheds protected by Waterkeeper's U.S. Member Organizations, including large waters of national importance such as the Chesapeake Bay, the Gulf of Mexico, the Cape Fear Estuary, and Lake Erie, as well as untold numbers of smaller but equally important waterways like the Black Warrior River in Alabama and the Grand River in Oklahoma. In watersheds impacted by CAFO industry pollution, the extent and intensity of the impacts to water and air quality and to health and quality of life are directly correlated to the density and extent of CAFO and slaughterhouse build-out in the area.

15.     Waterkeeper has three primary advocacy campaigns, one of which is "Pure Farms, Pure Waters," which advocates for controlling pollution from the CAFO industry. Waterkeeper regularly organizes training courses and informational panels at topic summits, regional meetings, and at annual Waterkeeper Alliance conferences that include workshops addressing pollution associated with the CAFO industry and how such pollution affects

neighboring waterbodies and communities. Additionally, Waterkeeper Alliance maintains

information on a webpage devoted to the CAFO industry, including information on regulation,

impacts, and legislative measures to prevent or reduce such impacts.

16.     For roughly two decades, Waterkeeper and its Member Organizations and

Affiliates have engaged in litigation and advocacy to combat pollution from the CAFO industry

and force regulation of the multinational livestock industry under state and federal laws.

Waterkeeper has participated in virtually all of the major litigation and regulatory initiatives

involving the regulation of this industry under the CWA and other environmental laws, and has

developed specialized expertise in the complex legal, factual and scientific issues associated with

this industry. Waterkeeper also advocates for more stringent regulation of the CAFO industry

before state and national officials, and for implementation and enforcement of existing law

through litigation.

17.     Waterkeeper was the lead plaintiff in a successful challenge to the U.S.

Environmental Protection Agency's (EPA) 2003 CWA regulations for CAFOs. The case,

decided by United States Court of Appeals for the Second Circuit, ensured CAFOs were required

to incorporate environmental controls into their permits and provide this information to the

public. *See Waterkeeper All., Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005). In 2010, a legal

challenge to EPA's revised CAFO rule in which Waterkeeper intervened resulted in a settlement

with EPA to develop important guidance for CAFO permitting and detailed information about

CAFOs across the country. *See Nat'l Pork Producers Council v. EPA*, 635 F.3d 738 (5th Cir.

2011).

18.     Waterkeeper was also the lead plaintiff in litigation challenging EPA's illegal

exemption of CAFOs from federal hazardous substance release reporting under CERCLA and

EPCRA, in which the D.C. Circuit held EPA's exemption of CAFOs from the statutory reporting mandates under CERCLA and EPCRA was unlawful and vacated the rule. *Waterkeeper All. v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017). Waterkeeper is currently a co-plaintiff in follow-up litigation challenging EPA's latest iteration of this regulatory exemption. *Rural Empowerment Association for Community Help v. EPA*, No. 18-cv-02260 (D.D.C. filed Sept. 28, 2018).

19.     Waterkeeper is also engaged as lead plaintiff in litigation challenging EPA's CWA definition of "waters of the United States" that reduces protections against CAFO pollution. *Waterkeeper v. Wheeler,* No. 18-cv-3521 (N.D. Cal., filed June 13, 2018). Waterkeeper is also a co-plaintiff in litigation challenging EPA's failure to revise Effluent Limitation Guidelines and promulgate Pretreatment Standards for slaughterhouses. *Cape Fear River Watch v. EPA*, No. 19-2450 (4th Cir., filed Dec. 18, 2019).

20.     Waterkeeper routinely provides comments to federal and state regulatory agencies on proposed regulations and permits affecting regulated pollution sources; advocates before state and local officials; and conducts educational outreach, training, and coordinated advocacy efforts with and for its members.

21.     For example, at the national level, Waterkeeper has filed comments and engaged in advocacy on proposals related to ensuring that CAFOs remain a National Enforcement Priority, antibiotic use at CAFOs is controlled, waterways are protected from pathogen pollution, nutrient pollution is controlled, contract farmers are protected against unfair contract terms, core information on CAFOs is collected by regulators and made available to the public, slaughterhouse dischargers are appropriately regulated, pollution trading proposals are consistent with the law, air emission data from CAFOs is collected, emissions are controlled by regulators, and many other issues.

22.     Waterkeeper has also submitted Freedom of Information Act (FOIA) requests to obtain information related to CAFOs and slaughterhouses. Waterkeeper often shares information obtained from public sources such as agency responses to FOIA requests with Member Organizations and Affiliates, as well as individual members and the public as large.

23.     At the state level, Waterkeeper and Member Organizations and Affiliates have filed comments, engaged in advocacy and/or filed litigation relating to dairy, poultry, and swine CAFOs in North Carolina, dairy CAFO regulations in New York, poultry and swine CAFO regulations in Georgia, CAFO regulations in Oregon, dairy regulations in Washington State, swine processing in Illinois, poultry CAFO regulations and permits in Maryland and the Chesapeake Bay, poultry CAFO permitting in West Virginia, dairy permits in California, and CAFO permitting in Ohio. Many of these efforts have held back efforts to reduce water quality protections and/or made improvements to the regulatory system.

24.     Waterkeeper frequently partners with Member Organizations and Affiliates to track and oppose new or expanding CAFOs or slaughterhouses in Member Organizations' and Affiliates' watersheds. Waterkeeper provides support by monitoring sources of information for updates on CAFO proliferation, including from federal and state government sources, social and traditional media, and from concerned members of the public. Waterkeeper further provides Member Organizations and Affiliates with connections to expert and legal advice and communications support. Waterkeeper will also partner with Member Organizations and Affiliates to write comments and launch legal challenges to stop or delay new or expanded CAFO and slaughterhouse construction.

25.     I am aware of at least 25 U.S. Member Organizations, spanning across the country, that have engaged in at least one effort to oppose CAFO industry proliferation in their

watershed. These Member Organizations seek to prevent the proliferation of the CAFO industry because of the significant impacts CAFOs and slaughterhouses have on water quality and communities' health and quality of life, and because these impacts only are exacerbated as the CAFO industry grows in a watershed and community.

26.      Waterkeeper utilizes information obtained through NEPA review to advance its mission. Waterkeeper has reviewed Environmental Assessments (EA) and Environmental Impact Statements (EIS) to understand the environmental and public health impacts of federal regulatory actions such as Clean Water Act jurisdiction, oil and gas leasing on public lands, mountaintop removal coal mining, and federal coal and mineral leases. Waterkeeper further has reviewed EAs and EISs to understand the environmental and public health impacts of the federal permitting of projects such as dams, CAFOs, mines, slaughterhouses, power plants, and pipelines. Waterkeeper uses this information to inform the environmental and public health issues we address in public education efforts, comments, and litigation. For example, Waterkeeper used information regarding environmental impacts in an EIS to launch a communications campaign advocating against a proposed slaughterhouse, which galvanized local opposition and prevented its construction. In Waterkeeper's litigation under the Clean Water Act, we have relied on information from an EA and Finding of No Significant Impact to identify legal and scientific shortcomings with the regulation at issue.

27.      Waterkeeper also participates in the NEPA review process by commenting on draft EAs and EISs. Waterkeeper's comments typically focus on ensuring that issues are fully considered in the scoping and draft EIS stages, as well as providing information on environmental and public health impacts that have not been considered or inadequately addressed. For example, as part of Waterkeeper's efforts to stop the environmentally destructive

proliferation of CAFOs, Waterkeeper has commented on an EA and FONSI for a poultry CAFO loan from the Farm Service Agency (FSA) in the Neuse River Basin of North Carolina.

28.     In recognition of the enormous role that NEPA review plays in assisting Waterkeeper fulfill its mission and protect the interests of its Member Organizations and all of our respective individual members, Waterkeeper has engaged in all stages of the Council on Environmental Quality's (CEQ) revisions to its implementing regulations for NEPA, as well as many other legislative and regulatory efforts to weaken federal environmental review. Since 2016, Waterkeeper has launched numerous communications efforts aimed at explaining the value of rigorous NEPA review and engaging the public in defending the principles and goals of NEPA. Waterkeeper provided guidance to assist members of the public with submitting comments on CEQ's 2018 Advanced Notice of Proposed Rulemaking, spoke out against the current Administration's rhetoric blaming NEPA for infrastructure failings, and encouraged comments on CEQ's proposed rulemaking. Additionally, Waterkeeper and many U.S. Waterkeeper Members submitted comments on both CEQ's Advanced Notice of Proposed Rulemaking and Notice of Proposed Rulemaking.

29.     CEQ's final rule is inconsistent with the objective and requirements of NEPA and causes injury to the interests of Waterkeeper and its U.S. Member Organizations, as well as to our individual members. CEQ's final rule decreases transparency and access to information regarding both the environmental impacts of the CAFO industry and the role the federal government plays in their proliferation. Furthermore, the final rule eliminates vital tools and opportunities to stop CAFO industry proliferation.

30.     Proposals by federal agencies, such as FSA and the Small Business Administration, to provide financial assistance to new or expanding CAFOs have historically

10

triggered a requirement for environmental review under NEPA, including public notice and an opportunity to provide public comment. Waterkeeper and numerous Member Organizations and individual members have gained valuable information from these disclosures and have commented on these environmental reviews.

31.     CEQ's final rule now categorically exempts federal funding of the CAFO industry from NEPA review. This means that Waterkeeper, our Member Organizations, and individual members will lose an important avenue of notice of new or expanding CAFOs and slaughterhouses and will lose information about newly proposed facilities. In some cases, this information may be impossible to obtain through other means. CEQ's changes prevent Waterkeeper and our members from voicing informed environmental concerns regarding new and expanding CAFOs and slaughterhouses and having those concerns meaningfully addressed by the federal agency before a CAFO or slaughterhouse is built.

32.     Having access to the information provided in environmental reviews of CAFOs and slaughterhouses prior to construction is important to Waterkeeper's and our Member Organizations' advocacy. It is nearly impossible to compel action to address the potential environmental impacts, either by stopping the project entirely or incorporating mitigation measures, after the CAFO has been funded, approved, and construction has begun. Part of the reason for this is that, often, the water and air quality impacts caused by CAFOs are fundamentally the result of cumulative industry impacts on a watershed, e.g., too many facilities sited in too small an area to safely and responsibly handle the waste. Therefore, technical updates or fixes after construction has begun are unlikely to consider or address such cumulative environmental impacts.

33.     Waterkeeper is further impacted by the lack of access to the information provided

in environmental reviews because we often engage in site-specific investigations to track sources

of water pollution. Environmental reviews provide information that is vital for these efforts, such

as an overview of the facility, waste management practices, and expected animal capacity. Now

that CEQ's regulations prohibit environmental reviews, Waterkeeper will need to spend more

staff time gathering the information necessary to identify and bring enforcement actions against

CAFOs that are violating permits and/or impacting water quality. Much of this information may

be extremely difficult, costly, or even impossible to obtain in the absence of a NEPA EA or EIS.

34.     CEQ's exemption of federal financing for the CAFO industry also obscures the

federal government's key role in encouraging the spread of this industry. Without agencies

preparing and providing notice of an environmental review, it is far more difficult and time-

consuming to determine whether a new CAFO, CAFO expansion, or slaughterhouse is being

propped up with taxpayer funds. This information is pertinent to Waterkeeper's mission because

our work focuses on promoting federal reforms and regulations, which includes reform of the

government's direct and indirect subsidization of the CAFO industry.

35.     In order to understand the extent to which federal funding is promoting CAFO

industry proliferation in U.S. Member Organization watersheds, Waterkeeper would likely have

to rely on FOIA requests. FOIA requests frequently result in arduous processes that often lead to

incomplete information and sometimes, litigation. Waterkeeper has had to engage in litigation to

compel federal agencies to provide full and timely responses to FOIA requests, and this

consumes staff time and other organizational resources that would otherwise be spent fulfilling

Waterkeeper's mission. Additionally, obtaining records via the FOIA request process can often

take many months or even years if litigation is required. If forced to rely solely on FOIA,

Waterkeeper likely would not receive necessary information until long after construction has

already begun. In some instances where NEPA documentation is the only documentation associated with a CAFO, Waterkeeper will be completely deprived of information that would otherwise exist but for CEQ's final rule.

36.     In instances where a federal agency may still be required to comply with NEPA, Waterkeeper and our members are still injured by CEQ's final rule because it allows for less rigorous environmental review. The rule no longer allows agencies to consider indirect or cumulative effects, and it reduces the overall scope and breadth of NEPA review in ways that render the process much less effective and useful to meet the statute's objectives than before.

37.     CEQ's final rule also injures Waterkeeper and our members because it shifts responsibility onto the public to provide specific and technical comments on agency proposals under NEPA. This alters our rights in the NEPA process and puts us and the public at large at a disadvantage in all future proceedings. Under CEQ's final rule, there is a greater chance that agencies will ignore comments that Waterkeeper or our members provide on an environmental review that an agency deems not to meet this new burden. To overcome this burden, Waterkeeper will need to either devote more staff time and resources to preparing comments, hire outside experts to prepare comments that meet this new higher regulatory standard, or forgo commenting altogether.

38.     CEQ's final rule also makes it more difficult for members of the public and public interest organizations such as Waterkeeper and our U.S. Member Organizations to successfully challenge an agency's noncompliance with NEPA. The opportunity to challenge an inadequate environmental review provides an opportunity to advocate for more thorough environmental review and meaningful mitigation measures, and additionally can be a valuable way to call much-needed attention to a project that is being pushed forward without adequate technical and

13

legal scrutiny. CEQ's final rule, by tipping the balance of power in favor of the agency conducting the review, eliminates opportunities for Waterkeeper to advance our mission through successful challenges of an inadequate environmental review. This change alters Waterkeeper's legal rights.

39.     Finally, because the final rule now allows agencies to merely summarize and respond to public comments generally rather than actually considering and assessing them, it will be impossible for Waterkeeper to know whether its concerns have been addressed by an agency. Without the procedural requirements of CEQ's prior rules, Waterkeeper has no guarantee that federal agencies will take a hard look at the full range of potential impacts of their actions that affect us and our members. This further alters Waterkeeper's legal rights in administrative processes.

40.     If the federal government issued NEPA review documents as part of its funding of the CAFO industry in the watersheds that Waterkeeper protects, and gave the public adequate opportunity to comment on the documents, then Waterkeeper and U.S. Member Organizations could submit comments and appear at any public hearings. Waterkeeper could provide guidance for interested members of the public to engage in the NEPA review process as well.

41.     If the Court grants Waterkeeper the relief it seeks, Waterkeeper, our Member Organizations and our individual members would see our rights under NEPA restored and our harms redressed. It would allow Waterkeeper to provide updates to its members and CAFO-affected communities, organize opposition efforts, advocate for better environmental protection measures, and ultimately protect watersheds around the country. This would restore strengthened environmental protections and potentially lower the risks to Waterkeepers and our Member Organizations' respective individual members' health and quality of life. At the very least, it

would provide Waterkeeper and all of its members with the participatory rights we are guaranteed under NEPA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 12th day of November, 2020, in Norwalk, Connecticut.

Daniel E. Estrin